E-filing

Walter K. Pyle (Bar No. 98213)
2039 Shattuck Avenue, Suite 202
Berkeley, CA  94704-1116
(510) 849-4424
*Attorney for Petitioner*

ORIGINAL
FILED

SEP 1 4 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAINT DEJUAN MOORE,

                *Petitioner,*

        v.

BEN CURRY, Warden,

             *Respondent.*

C07-04736 JSW

**POINTS AND AUTHORITIES
IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

# TABLE OF CONTENTS

POINTS AND AUTHORITIES..................................................................................1

    I.   THE PROSECUTOR'S FINAL ARGUMENT VIOLATED THE
        CONSTITUTIONAL PROHIBITION AGAINST COMMENT ON A
        DEFENDANT'S FAILURE TO TESTIFY...............................................2

    II.  IT WAS REVERSIBLE ERROR FOR THE PROSECUTOR TO ASSURE
        THE JURY THAT "AT THE CLOSE OF EVIDENCE THE
        PRESUMPTION OF INNOCENCE DISAPPEARS."  THIS
        DENIGRATED BOTH THE PRESUMPTION OF INNOCENCE AND
        THE REASONABLE DOUBT STANDARD.............................................6

    III. IT WAS PREJUDICIAL ERROR FOR THE PROSECUTOR TO VOUCH
        FOR THE CREDIBILITY OF HER WITNESSES.......................................7

    IV.  IT WAS ERROR FOR THE PROSECUTOR TO SUGGEST TO THE
        JURY THAT IF THEY ACQUITTED THE  DEFENDANTS THEY
        WOULD "PREY ON OTHER PEOPLE IN OUR COMMUNITY," AND
        THE TRIAL COURT'S STATEMENT AT THE CLOSE OF THE
        PROSECUTOR'S ARGUMENT DID NOT CURE THE PREJUDICE
        FROM THE REMARK. ........................................................................9

    V.  MISCONDUCT BY THE PROSECUTOR IN FINAL ARGUMENT TO
        THE JURY DEPRIVED PETITIONER OF A FAIR TRIAL. ..................10

    VI. THE ERRORS ARE PROPERLY PRESERVED FOR FEDERAL REVIEW ......12

CONCLUSION.....................................................................................................13

# TABLE OF AUTHORITIES

**CASES**

*Berger v. United States*, 295 U.S. 78 (1935)................................................8

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ..........................................11

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...........................................12

*Darden v. Wainwright*, 477 U.S. 168 (1986)............................................11

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)....................................11

*Griffin v. California* (1965) 380 U.S. 609 ............................................2, 3

*Harris v. Reed*, 489 U.S. 255 (1989)........................................................12

*Herrin v. United States*, 349 F.3d 544 (8th Cir. 2003).............................2

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006)...........................................2

*In re Winship*, 397 U.S. 358 (1970)...........................................................7

*Jackson v. Fogg*, 589 F.2d 108 (2d Cir. 1978)...........................................4

*Krulewitch v. United States*, 336 U.S. 440 (1949)...................................10

*Lent v. Wells*, 861 F.2d 972 (6th Cir. 1988)...............................................2

*Mahoney v. Wallman*, 917 F.2d 469 (10th Cir. 1990) .............................6, 7

*Murray v. Carrier*, 477 U.S. 478 (1986)..................................................12

*O'Neal v. McAninch*, 513 U.S. 432 (1995)..............................................6, 13

*People v. Rogers*, 56 Cal.2d 301 (1961 ....................................................6

*Strickland v. Washington*, 466 U.S. 668 (1984) .......................................12

*Thomas v. Hubbard*  273 F.3d 1164 (9th Cir. 2001)...............................11, 12

*United States v. Cotnam*, 88 F.3d 487 (7th Cir. 1996) ..............................2

*United States v. De La Fuente*, 8 F.3d 1333 (9th Cir. 1993)......................12

*United States v. Edwards* 154 F.3d 915 (9th Cir. 1998)..............................8

*United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007) ..........................4

*United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985) ..............................8

*Memo of Points & Authorities in Support of Petition for Habeas Corpus*

**CASES (Cont.)**

*United States v. Molina,* 934 F.2d 1440 (9th Cir. 1991)..................................................8

*United States v. Roberts,* 618 F.2d 530 (9th Cir. 1979) ..................................................8

*United States v. Wade,* 388 U.S. 218 (1967)....................................................................4

*United States v. Walker,* 9 F.3d 1245  (7th Cir. 1993) ...................................................9

**STATUTES**

28 U. S. C. § 2254 ...........................................................................................................4

28 U. S. C. § 2255 .........................................................................................................12

**UNITED STATES CONSTITUTION**

Fifth  Amendment .....................................................................................................3, 10

Sixth Amendment........................................................................................................12

Fourteenth  Amendment .........................................................................................10, 11

*Memo of Points & Authorities in Support of Petition for Habeas Corpus*

1

2

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5   SAINT DEJUAN MOORE,

6                                          *Petitioner,*

7                        v.

8   BEN CURRY, Warden,

9                                          *Respondent.*

10

11                    **POINTS AND AUTHORITIES**

12        Petitioner Saint Dejuan Moore asserts that the prosecutor's final argument

13   to the jury deprived him of rights secured by the Constitution, and seeks habeas

14   corpus relief. He submits the following memorandum in support of his petition.

15        The facts are related in the slip opinion of the California Court of Appeal,

16   pp. 1-4 (Copy attached hereto as Appendix). Two men tried to rob a man coming

17   out of an Oakland (California) currency exchange, and assaulted the man's wife

18   came to his aid. The would-be robbers fled in a white car with dark windows and

19   chrome rims. The man, his wife and daughter followed in their own car and

20   copied down the license number. They lost sight of the car for about two minutes,

21   but on their way home (RT 1635) they saw what they thought was the same car in a

22   Wendy's parking lot ("It was the car because of the rims" (RT 1635), several blocks

23   down International Boulevard. The car at Wendy's, however, had a different

24   license number.

25        Petitioner Moore and his companion, Barrow, were in the second car, and

26   they were arrested and prosecuted. Neither testified at trial. The only evidence

27   that they were the assailants was the eyewitness identification testimony of Sergio

28   Garcia, his wife Claudia Ayala, and their daughter Reyna Ayala.

I.

## THE PROSECUTOR'S FINAL ARGUMENT VIOLATED THE CONSTITUTIONAL PROHIBITION AGAINST COMMENT ON A DEFENDANT'S FAILURE TO TESTIFY.

The prosecutor argued to the jury that the defendants "failed to call logical witnesses in this case," that there was no evidence that the defendants were anywhere else but robbing the victims, and as for a possible alibi, "any defense attorney would make sure that if any such evidence existed, you would have it." (RT 2497.) Defendants protested, but the California Court of Appeal ruled that this was not *Griffin* error [see *Griffin v. California* (1965) 380 U.S. 609], as urged by the defendants, but was a legitimate comment by the prosecutor on the lack of defense alibi evidence. The court ignored the fact that the short time period since the crime meant only the defendants themselves could have given such evidence.

The applicable law is this: *Griffin v. California, supra* 380 U.S. 609 does not prohibit the prosecutor from commenting on the mere failure of the defendant to call anticipated witnesses to the stand. But—and this is an important "but," and it is the crux of the issue here—*Griffin* error *does* include an argument by the prosecutor that the State's evidence is uncontradicted, *if,* as here, the contradiction or denial could be provided only by the defendant, who therefore would be required to take the witness stand. *Hovey v. Ayers,* 458 F.3d 892, 912 (9th Cir. 2006). This rule is of universal application. See, e.g., *Lent v. Wells,* 861 F.2d 972, 976-977 (6th Cir. 1988) [violation if only defendant could have contradicted prosecution's evidence]; *United States v. Cotnam,* 88 F.3d 487, 497 (7th Cir. 1996) [violation if "highly unlikely" that anyone but defendant could rebut evidence]; *Herrin v. United States,* 349 F.3d 544, 546 (8th Cir. 2003) ["indirect" comment rises to constitutional violation if prosecutor manifestly intended to call jury's attention to defendant's failure to testify]. The reason such a comment is prohibited is that it

2

1

2  makes the defendant's assertion of his Fifth Amendment right costly to him.

3  *Griffin v. California, supra* 380 U.S. at 614.

4      Here only two minutes elapsed between the time the victims lost sight of

5  their assailants and the time they spotted the defendants' car (RT 1545),[1] and

6  possibly another two to five minutes had elapsed between the time the assault and

7  the time they lost sight of the white car.[2]  Out of the universe of some 6 billion

people on the earth who might have been able to give testimony as to the

8  defendants' whereabouts in the few minutes before they were seen in the Wendy's

9  parking lot the *only* possible "logical" witnesses were the defendants themselves.

10  *There is no other reasonable possibility.*

11      Nor is there any reason to believe he jury missed the logic of the

12  prosecutor's argument or its inevitable conclusion.  It must be remembered that

the prosecutor was not simply discussing general principles of evidence or the law

13  of assault.  The prosecutor, after all, was giving an argument *why the jury should*

14  *convict the defendants,* and urged the jury to take note that (1) the defendants

15  were in a position to offer testimony (in circumstances where they were the only

16  persons who could possibly give that testimony) as to their whereabouts at the

17  time of the assault, and (2) they did not.  Therefore, members of the jury, you

18  should hold their failure to produce evidence of their whereabouts against them,

19  and that is a good reason to convict them.  The prosecutor emphasized that

20  "nothing points to anybody else," and "no shred of evidence to indicate that

[defendants] were anywhere else," and if they had an alibi "you can bet your boots,

21  if you had anything by way of evidence, way of alibi, that you would offer it."  (RT

22  2499.)

23  _____

[1] We will reference in this case the Reporter's Transcript (RT) and the Clerk's
24  Transcript (CT) from Moore's state appeal.
   [2] Garcia testified that the assault itself lasted a minute-and-a-half (RT 1623), and only
a minute-and-a-half elapsed between the assault and the time they copied down the first
25  license number.  (RT 1721.)

26

*Griffin* clearly establishes the applicable federal law, and it says such arguments to the jury violate the Due Process Clause. The decision of the California Court of Appeal was clearly an unreasonable application of the applicable federal law. 28 U. S. C. § 2254(d)(1).

In determining the effect of the prosecutor's argument, it is significant here that the only evidence that the defendants in this case were the perpetrators was the identification testimony by the Garcia family. "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967); see also *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (en banc) [convictions based solely on eyewitness testimony are "highly suspect"] (quoting *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978).

The fact that the defendants' white car had a different license number (4 WCE 642) from the white car that fled the scene (2 VVM 660) was never satisfactorily explained by the State,[3] other than to suggest that Reyna had made a mistake when she copied down the first license number. That would have been a valid point if she wrote down an "N" instead of an "M," but a reasonable juror could conclude that the discrepancy in the numbers was simply too great to attribute it to a mere mistake in putting down an "M" instead of an "E," let alone a misstatement of all but one of the other numbers as well.

When Garcia relayed the license number of the defendants' car, the 911 operator responded, "Okay. You're giving me a different license plate number?" Garcia responded, "(Inaudible) but it's a white car that looks the same."[4] (RT 1529.)

---

[3] The prosecutor said, "That's not my job. . . . My job is to argue what the evidence is." (RT 2485-2486.)

[4] Garcia had listened to the 911 tape a couple of days before he testified. (RT 1669, 1720.) He said on cross examination that his response was, "I'm not sure if this is the car, but it looks like the same car." (RT 1681.)

4

Garcia had thought the suspect vehicle was an older Lincoln or a Cadillac (RT 1664), while the defendants' car was a Pontiac (RT 1996). A reasonable juror could conclude that the defendants were not the only persons in East Oakland with a white car that had tinted windows and chrome rims, and could also conclude that the identification testimony was influenced by factors other than an accurate recollection by the witnesses of the assailants' features. Right after the police stopped the defendants' car, the 911 operator assured the distraught Garcia family that the police had "already caught them" and told them, "They'll need you to identify them to make sure it's them, okay, but they caught them already. They caught two of them[5]. . . . Look, when the officers come talk to you, make sure you tell them they tried to mug you and they assaulted you and your wife, okay?" (RT 1540.) Garcia testified that even before he viewed the men the police had stopped, he believed they were the persons who attacked him. (RT 1621.) Nor did the officers admonish them before the field showup that these might or might not be the men. (RT 1583.)

The jury during deliberations asked to hear the 911 tape again (RT 2524) and later asked to have a readback of the testimony of Claudia Ayala and Reyna Ayala from the time physical contact was broken off at the currency exchange until they lost sight of the individuals in the white car. (RT 2558.)

Would the jury have reached the same verdict had the prosecutor's final argument not urged the jury to take into account the failure of the defendants to testify? Should one assume, in a case which turns on the credibility of the State's witnesses, that the error affected, or did not affect, the verdict?

---

[5] Garcia had seen a total of four men at the car who "mixed around there." (RT 1670.) Garcia related to dispatch that the two assailants got in a car and took off, and there were "two more in the car and we wrote the plate number." (RT 1535.) Later Garcia testified that two of the four men had walked away. (RT 1706.) Claudia initially told the dispatcher there were two additional persons in the white car for a total of four other persons involved. (RT 1523, 1525.) However, she later said she was just repeating what Garcia was telling her. (RT 1854.)

5

1

2     The Supreme Court has ruled that the risk of error by the State should be

3  born by the State.  "We conclude that the uncertain judge should treat the error,

4  not as if it were harmless, but as if it affected the verdict (i.e., as if it had a

5  'substantial and injurious effect or influence in determining the jury's verdict')."

6  *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

7     Moreover, this was not the only error committed by the prosecutor in her

8  final argument.  As the prosecutor progressed through her final argument,

9  improper comments made it more and more unlikely that the defendants

   received a fair trial.

10

## II.
### IT WAS REVERSIBLE ERROR FOR THE PROSECUTOR TO ASSURE THE JURY THAT "AT THE CLOSE OF EVIDENCE THE PRESUMPTION OF INNOCENCE DISAPPEARS." THIS DENIGRATED BOTH THE PRESUMPTION OF INNOCENCE AND THE REASONABLE DOUBT STANDARD.

11

12

13

14     The prosecutor next told the jury to disregard the presumption of innocence

   during their deliberations.

15     The prosecutor assured the jury that although the presumption of

16  innocence is important, "at the close of evidence, and specifically the close of

17  evidence in this case, the presumption of innocence disappears."  (RT 2500.)  This

18  is not the law, of course, and the prosecutor's assurance to the jury that it was

19  violated the defendants' right to a fair trial.

20     The presumption of innocence is intended to play a role in the jury's

   deliberations themselves and the jury's application of the reasonable doubt

21  standard of proof to the facts.  *United States v. Walker*, 9 F.3d 1245, 1250  (7th Cir.

22  1993) [burden of establishing defendant's guilt remains on government

23  throughout the trial];  *People v. Rogers*, 56 Cal.2d 301, 306 (1961) [only the  jury's

24  finding of guilt removes the presumption].

25

26                                      6

In *Mahoney v. Wallman*, 917 F.2d 469 (10th Cir. 1990) the prosecutor made a presentation similar to the case at bar, arguing that although it had been the jury's duty, while they were being selected, to presume the defendant was not guilty, "things have changed since that time," and the presumption of innocence no longer existed. "That presumption is not there any more." (*Id*. at 471.)

The *Mahoney* court expressed the view that a misstatement of law that affirmatively negates a constitutional principle is often a more serious infringement than, say, the omission of a requested instruction. (*Id*. at p. 473.) The requirement of proof beyond a reasonable doubt, which "provides concrete substance for the presumption of innocence," is essential to due process and fair treatment of the defendant. *In re Winship*, 397 U.S. 358, 363, 364 (1970). The prosecutor's remarks, said the *Mahoney* court, constituted an affirmative denial of the defendant's constitutional rights, requiring reversal of the conviction. 917 F.2d at p. 473.

The prosecutor's comments did the same in the case at bar.

## III.
## IT WAS PREJUDICIAL ERROR FOR THE PROSECUTOR TO VOUCH FOR THE CREDIBILITY OF HER WITNESSES.

We have pointed out that the credibility of the State's witnesses was crucial to the State's case. Indeed, it *was* the State's case. Thus if the prosecutor could enhance their credibility, the State's case would appear stronger in the eyes of the jury.

The prosecutor provided this enhanced credibility by personally vouching for their honesty. The prosecutor stated:

> The witnesses who came in here were honest about what happened. Sometimes they couldn't provide more information above and beyond what they said at the Preliminary hearing. Sometimes they could. ¶. . . They were only asked to come in here and tell the truth.

7

1

2

3
Each of them told you that, and they did their best to do so. (RT 2482-2483.)

4
These remarks in no way commented the nature of the evidence presented,

5
for there was no reference why any particular part of their testimony appeared

6
believable. Nor did the prosecutor speak about their demeanor on the stand.

7
Rather, the jury heard a statement by an officer clothed with the prestige of the

8
office of the prosecutor stating, "The witnesses we presented were honest."

9
The Supreme Court long ago pointed to the dangers of the prosecutor
asserting personal knowledge of the veracity of a witness. In *Berger v. United*

10
*States*, 295 U.S. 78 (1935) the Supreme Court recognized the special role of the

11
prosecutor in the criminal process. Not only does the prosecutor's duty include

12
see that guilt shall not escape, but that innocence shall not suffer. The average

13
jury "has confidence that these obligations, which so plainly rest upon the

14
prosecuting attorney, will be faithfully observed." *Id.* at 88. Improper suggestions
by the prosecutor are therefore in the eyes of the jury apt to carry substantial

15
weight against the accused when they should properly carry none. *Ibid.*

16
In *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1979) the court stated that

17
the rule in *Berger* had become a "well-established principle." *Id.* at 533. The

18
*Roberts* court pointed out such prosecutorial misconduct, often characterized as

19
"vouching," usually occurs in two ways: through the prosecutor's personal

20
assurances of a witness's veracity, or through remarks that bolster a witness's
credibility by reference to matters outside the record. *Ibid.*

21
In the case at bar, the prosecution's case depended entirely upon whether

22
the identification testimony of the State's witnesses should be believed beyond a

23
reasonable doubt. "When the credibility of witnesses is crucial, improper

24
vouching is particularly likely to jeopardize the fundamental fairness of the trial."

25
*United States v. Edwards* 154 F.3d 915, 921 (9th Cir. 1998) citing *United States v.*

26

8

*Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991); see also *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985) [jury may be inclined to give weight to the prosecutor's opinion in assessing the credibility of witnesses instead of making an independent judgment of credibility].)

### IV.
### IT WAS ERROR FOR THE PROSECUTOR TO SUGGEST TO THE JURY THAT IF THEY ACQUITTED THE DEFENDANTS THEY WOULD "PREY ON OTHER PEOPLE IN OUR COMMUNITY," AND THE TRIAL COURT'S STATEMENT AT THE CLOSE OF THE PROSECUTOR'S ARGUMENT DID NOT CURE THE PREJUDICE FROM THE REMARK.

Finally, the prosecutor suggested to the jury that if the jury found the defendants not guilty, they would be sending the defendants back into the community "to prey on other people in our community."

> You jurors are the voice of the community. If you want to acquit the defendants based on this license plate discrepancy, as the defense attorneys have tried to blow it up into a big issue, that's your decision. If you want to acquit them and release them back into your community to prey on other people in our community --
> (RT 2501-2501.)

The sequence of events after the defendants objected is important to an understanding of the effect of the prosecutor's remark on the jury.

The court told defense counsel "No speaking objections," and held a side bar.[6] The court then stated, "Please move on, Ms. Ynostroza." (RT 2502.) At the end of the prosecutor's argument the court told the jury they should not consider "the potential for future harm of these two defendants," and turned to the prosecutor and stated, "That should not have been a part of your argument." (RT 2503.)

---

[6] It appears that both defense counsel moved for a mistrial during the sidebar. (RT 2518.) The trial court, however, thought its subsequent admonition was sufficient. (RT 2517-2518.)

9

The court's admonition was a mild one, and an oblique one at that. Importantly, it was not made at the time of the misconduct. Just as important, the court did not tell the jury that the "future harm" it was talking about was the prosecutor's comment that a not-guilty verdict would send the defendants out to prey on others in the community, or tell them they did not bear responsibility for other crimes that might be committed in the community.

The prosecutor did not merely call the jury's attention to their general fear of crime, which would have been bad enough. The prosecutor's statement imposed *personal responsibility* on each and every juror for any further assaults— or worse—that might be committed by the defendants if the juror voted for a not guilty verdict. It also likely caused the jurors to consider the possibility that the prosecutor had personal knowledge of just what kind of men these were for her to make such a remark.

Would *any* admonition have unrung that bell? Would *any* instruction by the court have assured the members of the jury that they would be able to read the newspaper next week, or next month, without first turning to the crime section to look for the defendants' names? What a burden to place on the jurors!

This was the kind of misconduct that called for strong and immediate measures, not the mild rebuke which the California Court of Appeal found, with little discussion on the point, to have cured the error.[7]

## V.
### MISCONDUCT BY THE PROSECUTOR IN FINAL ARGUMENT TO THE JURY DEPRIVED PETITIONER OF A FAIR TRIAL.

The prosecutor's comment on the defendants' failure to testify violated petitioner's Fifth Amendment right to remain silent. The prosecutor's comment

---

[7] There comes to mind the statement of Mr. Justice Jackson in his concurring opinion in *Krulewitch v. United States*, 336 U.S. 440, 453 (1949): "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction. . . ."

that the presumption of innocence had already expired violated petitioner's right under the Fourteenth Amendment to proof beyond a reasonable doubt. Vouching for witnesses, and placing responsibility for any future crimes by the defendants on the jury's shoulders, were not in themselves violations of specific constitutional rights, but the Supreme Court has recognized that such improper prosecutorial comments can nevertheless be a constitutional violation if, taken together (and they should be viewed here together with the *Griffin* error and the no-presumption-of-innocence error as well), the errors deprived the defendant of a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986).

We believe that each of the errors was sufficient in itself, to have likely affected the jury's verdict in the circumstances of this case. But in any event, the improper comments by the prosecutor described above, when viewed together, constitute misconduct which denied petitioner due process of law under the Fourteenth Amendment. The Supreme Court in *Donnelly v. DeChristoforo*, *supra*, 416 U.S. 637 at 640, stated that a due process violation is based on the degree of prejudice caused by the misconduct. The degree of prejudice, in turn, depends on the circumstances of the entire trial.

The Ninth Circuit more was perhaps more explicit in *Thomas v. Hubbard* 273 F.3d 1164, 1179-1180 (9th Cir. 2001) in analyzing the *Donnelly* standard:

> "The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under *Brecht* [see *Brecht v. Abrahamson*, 507 U.S. 619 (1993)], whether an error had "a substantial and injurious effect" on the outcome.
>
> * * *
>
> In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," this court has recognized the importance of considering "the

11

cumulative effect of multiple errors" and not simply conducting "a balkanized, issue-by-issue harmless error review."

The law recognizes that the effect of errors in a case are cumulative, and in the circumstances of this case, this error, combined with the other errors which infected the prosecutor's closing argument, denied defendants a fair trial.

## VI.
## THE ERRORS ARE PROPERLY PRESERVED FOR FEDERAL REVIEW.

The California Court of Appeal noted that it did not appear that defense counsel properly preserved two of the errors for review (the lack of a presumption of innocence and improper vouching), but the appellate court nevertheless ruled that first comment constituted "no error" (Slip opn., p. 16) and the vouching statements were "permissible" comments. (Slip opn., p. 17.)

Sometimes the lack of a contemporaneous objection creates an "adequate and independent state ground" for denying relief.[8] Here, however, the issues are preserved for federal review for two reasons: (1) The state court actually reached the merits of petitioner's claims, and therefore did not rely on a procedural bar, in which case the federal courts may review the claims, *Coleman v. Thompson*, 501 U.S. 722, 733 (1991); *Thomas v. Hubbard, supra* 273 F.3d 1164, 1176; and (2) the failure to object was the result of ineffective assistance of counsel in violation of the Sixth Amendment,[9] which constitutes "cause and prejudice " *Murray v.*

---

[8] The procedural default rule is based on the principle that "the States should have the first opportunity to address and correct alleged violations of state prisoners' federal rights . . . [and] a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). If the state court considers the claim on the merits, however, "there is no basis for a federal habeas court's refusing to consider the merits of the federal claim." *Harris v. Reed*, 489 U.S. 255, 265, n. 12 (1989).

[9] Moore argued in his opening brief (pp. 23-24) and reply brief (p. 10), and again in his petition for rehearing (p. 6), as well as his petition for review to the California Supreme Court (p. 19), that counsel's failure to object constituted ineffective assistance. However, the California appellate court did not address the issue.

12

*Carrier*, 477 U.S. 478, 488 (1986) ["Ineffective assistance of counsel, then, is cause for a procedural default"]; *United States v. De La Fuente*, 8 F.3d 1333, 1336-1337 (9th Cir. 1993) ["cause" shown in § 2255 case by counsel's failure to assert constitutional claim without any conceivable tactical or strategic reason]; *Strickland v. Washington*, 466 U.S. 668, 694 (1984) [prejudice results if there is a reasonable probability (a probability sufficient to undermine confidence in the outcome) that but for counsel's errors the result would have been different; *O'Neal v. McAninch*, *supra* 513 U.S. 432, 435 [error resulting in substantial and injurious effect on the verdict is not harmless; if effect is uncertain, should be treated as prejudicial].

## CONCLUSION

The only evidence linking the defendants to the crime was the identification testimony of the eyewitnesses, and the discrepancy in license plate numbers seen on the white car immediately after the assault and on the white car in the Wendy's parking lot could never be explained. It is also clear that there is at least a reasonable likelihood that the witnesses' identification of the defendants was influenced by the expectation that the two men in the similar car were their assailants. A reasonable juror could have concluded that the identification testimony was flawed, and under those circumstances, the improper argument deprived defendant of a fair trial. The court should grant the writ.

Respectfully submitted,

Walter K. Pyle

13

# Appendix

## Opinion
## of the
## California Court of Appeal

### No. A111014

COPY

Filed 12/28/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

FILED
COURT OF APPEAL FIRST APPELLATE DISTRICT

DEC 2 8 2006

DIANA HERBERT, CLERK
.................................DEPUTY CLERK

THE PEOPLE,

    Plaintiff and Respondent,

v.

SAINT DEJUAN EMERSON MOORE
et al.,

    Defendants and Appellants.

A111014

(Alameda County
Super. Ct. No. 149530)

This case arises from a botched attempted strong-arm robbery of victims who would not give up on the streets of East Oakland. A jury convicted defendants Maurice Gregory Barrow and Saint DeJuan Emerson Moore of the attempted second degree robbery of Sergio Garcia, during which Barrow personally inflicted great bodily injury. (Pen. Code, §§ 211; 12022.7, subd. (a).) The jury also convicted Moore of the assault by means of force likely to produce great bodily injury to Sergio's wife, Claudia Ayala. (Pen. Code, § 245, subd. (a)(1).)

Defendant Barrow contends the People used a peremptory challenge to exclude an African-American potential juror in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). Defendant Moore contends the People committed four instances of prejudicial prosecutorial misconduct during closing argument to the jury. Each defendant joins in the other's arguments. We reject their contentions and affirm. There was no *Wheeler* error, and any prosecutorial

1

misconduct is not prejudicial given a curative admonition and the strong substantial evidence of guilt.

## I. FACTS

Under applicable standards of appellate review, we must view the facts in the light most favorable to the judgment of conviction, and presume in support of the judgment the existence of every fact which the jury could reasonably find from the evidence. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Neufer* (1994) 30 Cal.App.4th 244, 247.)

On Sunday, January 30, 2005, at approximately 8:30 p.m., Sergio Garcia drove into the parking lot of a check cashing business at High Street and International Boulevard. He went into the business to buy some money orders. His 22-year-old wife, Claudia Ayala, stayed in the car. So did her 16-year-old sister, Reyna Alaya. Although it was nighttime, it was "not too" dark—there was "50 percent lighting" from advertising signs.

After he bought the money orders, Sergio went back to his car. As he was unlocking the driver's door, a man came up to him from his right side and asked him for his money. The man's tone of voice was a "little bit mad and strong." Sergio described the man as African-American, thin, wearing a sweatshirt with a hood over his head, and sporting an earring in his right ear.

Sergio told the man that he did not have any money. The man lunged at Sergio and tried to take his wallet from his left pants pocket. The two men grappled and fell to the ground. Sergio positively identified defendant Barrow in court as the man who approached and assaulted him, and was certain of his identification.

A second man arrived and started pulling on Sergio's leg. Sergio described the second man as African-American, "a little heavier," wearing a dark shirt with white lettering, and with "an angry face." Sergio positively identified defendant Moore in court as the second man, and was certain of his identification.

Claudia got out of the car and screamed at defendants to leave Sergio alone. She put her hand on Moore's shoulder. Moore turned and struck Claudia in the face with a

closed fist. Claudia screamed. Moore hit her again. Claudia positively identified Barrow in court as the first man, and Moore as the second man.

Barrow struck Sergio on the left side of his face. Sergio stood up and screamed for someone to call the police for help. He saw that Claudia's face was swollen.

Barrow and Moore then left, walking away slowly. The assault had lasted about a minute and a half.

Sergio and Claudia got back into their car, and began to follow defendants. Defendants started to run. Claudia called 911 on her cell phone and reported the assault, but she was nervous and had trouble communicating with the operator. (Claudia spoke in both Spanish and English.) Sergio took the phone and spoke to the 911 operator in Spanish.

Sergio followed defendants until they got into a parked car. Sergio described the car as a white Cadillac or Pontiac with chrome rims and tinted rear windows. Sergio identified a photograph of the white car in court. The white car drove in Sergio's direction and stopped. The driver got out and made a motion as if he were drawing a gun. Sergio put his car in reverse and backed away. The driver got back into the white car and drove off. Sergio followed the white car.

At some point, Sergio lost sight of the white car for about two minutes.

The tape of the 911 call was played for the jury, and depicts Claudia telling the 911 operator that the white car's license plate number was "4WCE642," which the operator later repeated (erroneously) as "4 WTEC42." Sergio took over the conversation with the operator while he was still following the white car. He first gave the number given by Claudia, but then said that was wrong and gave the license plate number as "2VVM660."

During the chase, Reyna wrote down the license plate number of the white car on an envelope. There were actually two numbers on the envelope—Sergio identified the bottom number, 2VVM660, as the license plate number he saw on the white car. He identified the license plate number both from the envelope and from two photographs of the white car.

3

Sergio explained the discrepancy between the two license plate numbers. The first number was given to him by 16-year-old Reyna, who apparently was nervous and did not read the white car's license plate number correctly; the second number, 2VVM660, was the number Sergio himself actually saw on the white car. Claudia testified that she, Sergio, and Reyna were all nervous while they tried to get the license plate number as Sergio chased the white car.

Sergio stayed on the line with the 911 operator and relayed the locations of the white car as he followed it. Eventually, a police car met up with him and he pointed out the white car in front of him. The police car began to follow the white car with its lights activated. Sergio followed. After a freeway chase, the police caught up to the white car and stopped it in Emeryville. Sergio parked nearby.

The police came over to Sergio's car and spoke with Sergio and Claudia. The police took Sergio in a squad car to the place where the white car had been stopped. Sergio identified two men, the one who had assaulted him (defendant Barrow) and the one who had assaulted Claudia (defendant Moore). Claudia also made an in-field identification of Barrow and Moore.

Defendant Moore was found in possession of a Tec-9 pistol, which is an assault weapon.

As a result of the incident, Sergio suffered a fractured lower jaw, which required surgery to wire his jaws together. The injury was on the left side, consistent with his having been struck by a right-handed person.

Defendants did not testify or present any witnesses. In closing argument, their counsel argued a defense of mistaken identity. Stressing the existence of two different license plate numbers, counsel argued that Sergio and Claudia had identified the wrong car and were mistaken in their identification of defendants—and that defendants were innocent.

The jury convicted defendants Barrow and Moore of the attempted second degree robbery of Sergio, during which Barrow personally inflicted great bodily injury. The jury convicted defendant Moore of the assault by means of force likely to produce great

4

bodily injury of Claudia, plus two offenses related to the assault weapon possession. The trial court sentenced defendant Barrow to five years in prison and defendant Moore to five years four months.

## II. DISCUSSION

Defendant Barrow contends the People used a peremptory challenge to exclude an African-American potential juror in violation of *Wheeler* and *Batson*.[1]  Defendant Moore contends the People committed four instances of prejudicial prosecutorial misconduct during closing argument to the jury. Each defendant joins in the other's arguments. We reject their contentions and affirm. There was no *Wheeler* error, and any prosecutorial misconduct is not prejudicial given a curative admonition and the substantial, if not overwhelming, evidence of guilt.

### A. *Wheeler* Error

Defendants contend the prosecutor impermissibly used a peremptory challenge to remove an African-American prospective juror from the jury panel solely on the basis of his race. After considering the matter, the trial court determined that the prosecutor exercised her peremptory challenge of the African-American prospective juror for legitimate, race-neutral reasons. This determination is supported by the record. Given the deference we must extend to the trial court, we uphold this determination and conclude there is no abuse of discretion and no merit to defendants' contention.

### 1.

In *Wheeler*, our Supreme Court held that the California Constitution prohibited the use of peremptory challenges to exclude jurors on the basis of group bias, i.e., solely

---

[1] *Batson* is essentially *Wheeler*'s federal counterpart. Defendants' arguments rely primarily, and substantially, on *Wheeler* and its California progeny. For the sake of simplicity we will use references such as "*Wheeler* motion," "*Wheeler* error," and so forth, with the understanding that defendants raise corollary federal grounds for error. Our analysis and disposition of the case would be the same regardless of whether defendants refer to *Batson*.

because of their membership in a cognizable class such as race or religion.[2] (*Wheeler, supra,* 22 Cal.3d at pp. 276-278, 287.) It is well settled that African-Americans are a cognizable class within the meaning of *Wheeler.* (*People v. Alvarez* (1996) 14 Cal.4th 155, 192-193 (*Alvarez*).)

But a peremptory challenge may constitutionally be exercised on the basis of specific bias, i.e., "a bias relating to the particular case on trial or the parties or witnesses thereto." (*Wheeler, supra,* 22 Cal.3d at p. 276.) "[T]he law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Id.* at p. 275.)

It is important to remember the legitimate bases for peremptory challenges, which include various factors which suggest the possibility of pro-defense or pro-prosecution bias. "For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority." (*Wheeler, supra,* 22 Cal.3d at p. 275.)

As *Wheeler* elaborated, such factors may be less focused on the background or basic impression of a potential juror, but more commonly involve a "gut feeling" or the seat-of-the-pants subjectivity of prosecutors and defense attorneys alike. "Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries *353)—upon entering the box the juror may have

---

[2]Subsequently, the United States Supreme Court ruled that such use of peremptory challenges violated the federal Constitution. (See *Batson, supra,* 476 U.S. 79.)

smiled at the defendant, for instance, or glared at him." (*Wheeler, supra,* 22 Cal.3d at p. 275.) In more modern terms, a peremptory challenge may be based on a "hunch" or even an arbitrary reason, "so long as the reasons are not based on impermissible group bias. [Citation.]" (*People v. Turner* (1994) 8 Cal.4th 137, 165 (*Turner*).)

For a number of reasons, including respect for counsel as officers of the court, it is presumed that a prosecutor's peremptory challenge is exercised "on a constitutionally permissible ground." (*Wheeler, supra,* 22 Cal.3d at p. 278.) That presumption is rebutted if the defendant shows a prima facie case that peremptory challenges were exercised solely on the basis of group bias. (*Id.* at pp. 278-281; see *Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*); *Alvarez, supra,* 14 Cal.4th at p. 193.)[3]

If the defendant makes a showing of a prima facie case, the burden shifts to the prosecutor to show that the peremptory challenges were made on the basis of specific bias, i.e., legitimate race-neutral factors reasonably relevant to the particular case being tried or its parties. (*Wheeler, supra,* 22 Cal.3d at pp. 281-282; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1216.)

Once a race-neutral explanation is put forth by the prosecutor, the trial judge must determine whether the defendant has proven the challenge was based on group bias rather than legitimate nondiscriminatory reasons. (*Johnson, supra,* 545 U.S. at p. 168; *Wheeler, supra,* 22 Cal.3d at p. 282; see *People v. Johnson, supra,* 47 Cal.3d at p. 1216.) "The trial court . . . must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" (*People v. Johnson, supra,* 47 Cal.3d at p. 1216, quoting *People v. Hall*

---

[3] In *Johnson*, the United States Supreme Court invalidated California's requirement that a defendant show a prima facie case by a standard of "more likely than not" that the challenge was based on discrimination or group bias. All a defendant need show is evidence sufficient to permit the trial judge to draw an inference that the challenge was so based. (*Johnson, supra,* 545 U.S. at pp. 168-173.)

(1983) 35 Cal.3d 161, 167-168; see *People v. Silva* (2001) 25 Cal.4th 345, 385-386
(*Silva*).)

**2.**

We turn now to the facts of this case. The People used their peremptory
challenges to excuse three African-American prospective jurors from the jury panel.
Defendants challenge only the second of the three peremptory challenges. We discuss all
three to provide the proper context for defendants' *Wheeler* motion and their arguments
on appeal.

*Challenge #1.* On voir dire, prospective juror Rosalind E. said "I have some bad
children, some sons. My brothers, also, [have] been in trouble." Her brother and older
son had been arrested, and her younger son was on parole. She said that when she
walked into the courtroom for jury voir dire, she felt "the pain and grief of [defendants']
parents because of what I go through with my [younger] son." She had siblings and
friends involved in drugs. Her younger son was a drug addict and was still involved with
the criminal justice system. The two defendants were similar in age to her son, and she
admitted she might be a "better juror" in a different type of case with different
defendants.

The People challenged Rosalind E. for cause. The trial court denied the challenge.
The People then used a peremptory challenge to excuse Rosalind E.

In the proceedings on the subsequent *Wheeler* motion, the trial court stated that it
"clearly saw the reason" for the People's challenge to Rosalind E. for cause, and for
using a peremptory challenge when the challenge for cause was denied. Defendants
concede both (1) that the trial court viewed the peremptory challenge as based on a "non-
discriminatory" reason, and (2) that defendant did not object to the People's use of the
peremptory challenge and thus "conceded the challenge."

*Challenge #2.* At the outset of his voir dire by the court, prospective juror Paul O.
responded to the jury questionnaire by admitting that both he and family members had
been arrested. He also stated that he had served on three juries and had friends in law

8

enforcement, including the father of a former Oakland Chief of Police. He believed he could be a fair juror to both sides.

The prosecutor questioned Paul O. about his family members' arrests:

"Q. [BY THE PROSECUTOR] Okay. You mentioned that some family members or a family member had been arrested as well.

"A. [RESPONSE BY PAUL O.] (Nods head in the affirmative.)

"Q. What can you tell us about that? What the arrest was for? Their relationship to you?

"A. Well, these are—I have a relative that lives here in Oakland that was arrested. I don't know what the exact charge was, but this was in the last couple of years. It involved child molestation, and I don't know what the resolution of that is.

"And I have a relative in another state that's incarcerated.

"Q. Do you know what that's for?

"A. It's—I don't know the details of it. I think it was parole violation.

"Q. Do you know what the underlying crime was?

"A. Not directly. Only thing I know is hearsay, and it has also to do with pedophilia."

Neither defendant asked any questions of Paul O.

The People exercised a peremptory challenge to excuse Paul O. Defendants then made a *Wheeler* motion. Referring to Rosalind E., defendants argued the People had made two peremptory challenges against African-American prospective jurors, and noted there was only one African-American left in the pool of prospective jurors. The defense argued the two challenges were made based on race. Defendants noted there would be an issue in the case of cross-racial identification, since defendants were African-American and the victims were Hispanic.

It was at this point that the trial court stated that it understood the valid reasons for the peremptory challenge to Rosalind E., once the court had denied the challenge to her for cause. The court observed that the challenge to Paul O. was the 15th peremptory challenge by the prosecution: "The rest have been a mixed group, but mostly . . . male

9

and female . . . [a] Caucasian, with a couple of people that might have been [of] Asian descent."

The court found a prima facie case under *Wheeler*, noting facts that commended Paul O. as a juror: he had served on juries in the past, was a long-time employed resident of Oakland, and his arrest had been "some time ago." The court thus required the prosecutor to state "a race-neutral explanation" for the peremptory challenge.

This was the prosecutor's explanation:

"I asked questions of Mr. O[.], and both defense attorneys chose not to ask questions of him. And my questions were based upon his responses to both the questionnaire as well as the follow-up questions by Your Honor.

"He specifically was asked questions about his arrest, and family members who had been arrested, and also about any sentiments about Oakland.[4] *I felt as if when I asked him questions, I was pulling teeth. I felt—I don't want to use the term 'evasive', because I don't think it rose to that level, but I did not feel that he was forthcoming with all of the information.*

"I felt that—I can't say with absolute certainty, because I can't get in his mind, because we have to take what he says at face value, but he mentioned one family member about a child molest[ation], one family member about some other molestation charge, or pedophilia, I believe is what he said.

"And so I can't say with certainty that he wasn't just uncomfortable with what the charges were or what the accusations were, but when I asked him about the family member who is out of state who is in custody, he is on a parole violation, *and I asked him what the basis for that was for, I felt that I wasn't getting forthcoming information.*

---

[4] During his questioning by the judge, Paul O. mentioned that the former Oakland Police Chief (whose father he knew) had relocated to Vacaville, and was "[p]robably [doing] a lot better than here." The prosecutor later asked him what he meant by that comment, in an apparent attempt to see if Paul O. had negative feelings about Oakland. Paul O. replied that he simply meant the former Oakland Police Chief had fewer responsibilities in Vacaville.

"It's obviously very important for each party in this case, and in all cases, to have a good working understanding of who it is we are considering to be a member of our jury panel. *And based upon the question that I asked in the period of time that the [c]ourt allowed us today for new jurors in the box, I did not feel that I had sufficient information to make me comfortable with Mr. O[.] as a juror on this particular case.* " (Italics added.)

The defense responded that it appeared Paul O. "doesn't know too much" about his family member's arrests, and if the prosecutor felt she wasn't "getting straight answers from him" she "could have asked more questions."

The court took the *Wheeler* motion under submission until the following morning. The court spent from 5:00 p.m. to 7:00 p.m. at the courthouse reviewing the motion. When the court reconvened, the court informed the parties that it had spent considerable time reviewing the pertinent case law and a transcript of the court's and the prosecutor's questioning of Paul O. The court noted that peremptory challenges are presumed to be exercised in a constitutional manner, and the burden is on the party objecting to the challenge to show the challenge was based on the impermissible motive of group bias.

The court noted that there had not been "something leading up to Mr. O[.] that I found strongly questionable," i.e., the only prior challenge to an African-American juror had been to Rosalind E.—and that "situation was close to excusing her for cause." The court saw no pattern in misuse of peremptory challenges, while recognizing that a pattern can be shown "with just one." The court concluded it was "the prosecution's right to enter a peremptory challenge just based on a feeling or hunch. If there had been a pattern of excusing other jurors on this kind of basis, I might feel more strongly about it. I might feel more strongly about it in this case in the future."

The court denied the *Wheeler* motion with the proviso, "I will be watching."

*Challenge #3.* The voir dire of an African-American prospective juror we will refer to as "Juror 12," because of the unusual initials of his surname, had occurred prior to Paul O.'s. Well after the challenge to Paul O., the People exercised a peremptory challenge against Juror 12.

11

Defendants made another *Wheeler* motion, arguing that the prosecutor had used her last peremptory challenge to exclude the sole remaining African-American on the jury panel. The trial court asked the prosecutor to state race-neutral reasons for the challenge. She noted that Juror 12 had a recent arrest for a crime of violence. Defendants admit they did not respond to the prosecutor's statement. The trial court noted Juror 12 "has had some run-ins with the law" and denied the *Wheeler* motion— noting "I'm not pleased that we don't have any African-Americans on this jury." Defendants admit they did not respond to the trial court's conclusions.

### 3.

On appeal, defendants do not challenge the use of peremptory challenges against Rosalind E. and Juror 12. They directly challenge only the exclusion of Paul O. The trial court considered the prosecutor's explanation for the peremptory challenge to Paul O., and determined that the prosecutor did not exercise the challenge on the impermissible ground of group bias.

"The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citations.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75.)

We must give "great deference to the trial court in distinguishing bona fide reasons from sham excuses. [Citations.]" (*Turner, supra,* 8 Cal.4th at p. 165.) The *Wheeler* court recognized that appellate courts can "rely on the good judgment of the trial courts" in separating the constitutional wheat from the discriminatory chaff of peremptory challenges. (*Wheeler, supra,* 22 Cal.3d at p. 282; see *People v. Johnson, supra,* 47 Cal.3d at p. 1216.)

The trial courts necessarily make credibility determinations based in no small part on those subjective and intangible factors, such as body language and the manner of answering questions, which are legitimate components of the peremptory challenge calculus which do not run afoul of the *Wheeler* rule. (See *People v. Montiel* (1993) 5

Cal.4th 877, 909; *People v. Johnson, supra,* 47 Cal.3d at pp. 1218-1222.) Such factors also include "tone, demeanor, facial expression, [and] emphasis." (*People v. Dunn* (1995) 40 Cal.App.4th 1039, 1050 (*Dunn*).) The trial judge sees the person and hears his or her voice while we only have the benefit of the transcript.

Such credibility determinations are solely the province of the trial court. Ultimately, we must affirm if the record suggests grounds on which the prosecutor might reasonably have peremptorily challenged the jurors in question. (*Turner, supra,* 8 Cal.4th at p. 165; *People v. Howard* (1992) 1 Cal.4th 1132, 1155.) We review a ruling denying a *Wheeler* motion on a standard of substantial evidence. (*People v. Jones* (1998) 17 Cal.4th 279, 293.) And the burden is on the opponent of the challenge, here defendants, to show the challenge was exercised on the basis of group bias. (*Dunn, supra,* 40 Cal.App.4th at p. 1051.)

Given the substantial evidence standard of review, the burden on the opponent of the challenge , and the appropriate deference we must extend to the trial court, we conclude the peremptory challenge was proper and there is no *Wheeler* error.

The prosecutor was concerned about Paul O.'s family members having been arrested. Her first question to Paul O. regarding those arrests elicited a nonverbal response, uncharacteristic of the prospective juror's other voir dire responses. Paul O. knew few details of the charges against two family members, and seemed reluctant to identify the substantive offense for which a relative had been incarcerated out-of-state. When asked the crime for which the relative was imprisoned, Paul O. first said it was a "parole violation"—only when pressed further did Paul O. say he did not "directly" know the underlying crime: "Only thing I know is hearsay, and it has also to do with pedophilia."

The prosecutor told the trial court she felt Paul O. was not forthcoming with all pertinent information, and characterized her questioning as "pulling teeth." She felt she did not have sufficient information to be comfortable with Paul O. as a juror. The trial court accepted this explanation, indicating it had studied the transcript of the voir dire and that the prosecutor permissibly excluded Paul O. based on a hunch. The prosecutor's

13

concerns about the prospective juror are race neutral, plausible, and supported by the record. "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*Silva, supra,* 25 Cal.4th at p. 386.)

In light of our standard of review, and our need to defer to the trial court's observation of the demeanor and courtroom conduct of both Paul O. and the prosecutor, we cannot conclude that the prosecutor excluded Paul O. because he was African-American. (*People v. Reynoso* (2003) 31 Cal.4th 903, 926.)

Defendants contend that the trial court made an insufficient inquiry, i.e., did not make a sincere and reasoned attempt to evaluate the prosecutor's reasons for the challenge, and thus the court's determination is not entitled to deference. (See *People v. Allen* (2004) 115 Cal.App.4th 542, 548 (*Allen*).) We disagree. The record shows that the trial judge made a sincere and reasoned attempt that was both diligent and thoughtful. The court had a transcript of the voir dire prepared, and spent the evening reviewing the transcript and the applicable case law. The next morning the court explained its evaluation of the prosecutor's reasons—and because those reasons were plausible and supported by the record, the trial judge did not have to make detailed findings or follow any particular script.

Defendants also contend that the prosecutor's reasons for her challenge were impermissibly vague. Defendants rely on *Allen, supra,* 115 Cal.App.4th at pp. 551-552, where a juror was excluded for such vague reasons as " 'dress' " and " 'demeanor.' " The reasons given by the prosecutor in this case are specific and are supported by the style of the prospective juror's less-than-forthcoming voir dire responses.

We conclude that defendants have not demonstrated *Wheeler* error.

### B. Prosecutorial Misconduct

Defendants contend the prosecutor committed prejudicial misconduct on four occasions during her closing argument to the jury. We find either no misconduct or no reversible error.

14

**1. Alleged *Griffin* Error.** Defendants contend the prosecutor commented on their right to not testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). The prosecutor argued as follows: "Now, although the defense is not required to call any witnesses, the burden of proof is completely on me, the District Attorney's Office, to prove beyond a reasonable doubt the defendants' guilt. The defense in this case both failed to call logical witnesses in this case." After defendants objected, citing *Griffin*, the trial court clarified that the jury could not consider defendants' failure to testify.

The prosecutor further argued: "What I'm doing at this time is I'm commenting on the state of the evidence and the failure of the defense to introduce material evidence or to call logical witnesses. [¶] . . . [¶] [¶] Keep in mind that there is not a shred of evidence, not a shred to suggest that anybody else did the attempt[ed] robbery or assaulted Sergio or Claudia other than defendants . . . . Not a shred. There is no shred of evidence to indicate that defendant[s] were anywhere else on the evening of January 30, 2005. Nothing. [¶] Put yourself in the position of being a defendant, and you can bet your boots, if you had anything to offer by way of evidence, by way of alibi, that you would offer it. Be assured of that. Be assured of the fact that any defense attorney would make sure that if any such evidence existed, you would have it. You don't have it."

The prosecutor's comments are not *Griffin* error but a legitimate comment on the lack of defense alibi evidence. "*Griffin* . . . protects a defendant's right not to have the prosecutor comment on his failure to testify. A prosecutor is permitted, however, to comment on a defendant's failure to introduce material evidence or call logical witnesses. [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 554 (*Brown*); see *People v. Morris* (1988) 46 Cal.3d 1, 35-36 (*Morris*), disapproved on unrelated grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5, 545, fn. 6.)

Both *Brown* and *Morris* approve of arguments such as the one made by the prosecutor in this case, commenting on the lack of alibi evidence. (*Brown, supra,* 31 Cal.4th at pp. 552, 554; *Morris, supra,* 46 Cal.3d at pp. 35-36.) "By directing the jury's attention to the fact defendant never presented evidence that he was somewhere else

15

when the crime was committed, the prosecutor did no more than emphasize defendant's failure to present material evidence. He did not capitalize on the fact defendant failed to testify." (*Brown, supra,* at p. 554.)

**2. Comment on the Presumption of Innocence.** The prosecutor argued that "The presumption of innocence is important, and it exists at the beginning of all criminal cases. But at the close of evidence, and specifically the close of evidence in this case, the presumption of innocence disappears."

Defendants contend this was a misstatement of the law in violation of their constitutional rights. Relying to some extent on older authorities, defendants claim that the presumption of innocence continues throughout the trial and the deliberations of the jury, and is dispelled only by a verdict of guilt. (See, e.g., *People v. Hardwick* (1928) 204 Cal. 582, 594-595; *People v. Ye Foo* (1907) 4 Cal.App. 730, 740.)

It does not appear that this instance of alleged misconduct has been preserved for appellate review by a proper objection and request for admonition. (See *Brown, supra,* 31 Cal.4th at p. 553.) In any case, there is no error. Penal Code section 1096 states that defendant "is presumed to be innocent until the contrary is proved . . . ." This language is contained in CALJIC No. 2.90, which was given to the jury in the present case. Thus, the jury was properly instructed on the presumption of innocence and was not misled by the prosecutor's remark. The jury doubtless knew defendants were presumed innocent until the People had proven to the contrary, i.e., presented evidence of their guilt beyond a reasonable doubt. (See *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189.) The presumption of innocence is overcome when the jury is convinced that a defendant is guilty beyond a reasonable doubt and returns a verdict in accordance with that quantum of proof.

**3. Alleged Vouching for Witness Credibility.** The prosecutor referred to Sergio, Claudia, and Reyna in closing argument: "The witnesses who came in here were honest about what happened. Sometimes they couldn't provide more information above and beyond what they said at the Preliminary Hearing. Sometimes they could. [¶] They

were only asked to come in here and tell the truth. Each of them told you that, and they did their best to do so."

Defendants contend this was improper vouching for the credibility of the victim-witnesses. Again, there does not appear to have been an objection to preserve this issue for appeal. In any case, the prosecutor's comments were confined to matters within the record—rendering her comments permissible. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 433; *People v. Farnam* (2002) 28 Cal.4th 107, 170.) The prosecutor was properly commenting on the credibility of certain witnesses based upon their testimony and demeanor during trial.

**4. Reference to Defendants as Predators.** As she neared the conclusion of her argument, the prosecutor commented: "You jurors are the voice of the community. If you want to acquit the defendants based on this license plate discrepancy, as the defense attorneys have tried to blow it up into a big issue, that's your decision. If you want to acquit them and release them back into your community to prey on other people in our community—"

At this point defendants objected and assigned the comments as misconduct. The prosecutor moved on to other points on the direction of the court. The rest of her argument was only three paragraphs long. When the prosecutor finished, the court admonished the jury "about the comment made by [the prosecutor] about the potential for future harm of these two defendants should not be considered by you. [¶] That should not have been a part of your argument. [¶] Please remember that the instruction does indicate that both the People and the defendants have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach just verdicts, regardless of the consequences."

We agree that the prosecutor's remark was improper. But the almost immediate admonition of the court cured any error. (See *People v. Perry* (1972) 7 Cal.3d 756, 791; *People v. Pitts* (1990) 223 Cal.App.3d 606, 692.) There is no prejudicial misconduct. We note too that the evidence of guilt is more than substantial.

## III. DISPOSITION

The judgments of conviction are affirmed.

_____

Marchiano, P.J.

We concur:

_____

Stein, J.

_____

Margulies, J.

*People v. Moore et al., A111014*

19